**MICHELE AMORUSO E FIGLI, Francesco Amoruso, Giovanni Amoruso, Nicola Amoruso, and Vito Amoruso, Plaintiffs,**

v.

**FISHERIES DEVELOPMENT CORPORATION and Raymond E. Gerson, Defendants.**

**No. 80 Civ. 3404.**

United States District Court, S. D. New York.

Oct. 22, 1980.

---

David J. Rabbach, New York City, for plaintiffs.

Peirez, Ackerman & Levine, Great Neck, N. Y., for defendants; John M. Brickman, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs seek a declaratory judgment that certain agreements between them and the defendants are illegal and unenforceable. The action was commenced some six weeks after the defendants had instituted an arbitration proceeding pursuant to a provision contained in the agreements. Plaintiffs also seek a stay of the arbitration pending the determination of this action. The defendants cross move to stay this action pending arbitration as well as for other relief. Following final argument of the motions and the submission of extensive briefs, the parties are in accord that their respective motions are ripe for summary judgment disposition pursuant to Rule 56 of the Federal Rules of Civil Procedure. To put the issues raised under their motions in proper focus, it is desirable to identify the various parties and their components.

## I. *The Facts*

The plaintiffs are an Italian partnership, Michele Amoruso e Figli, and its four partners and principals, Francesco, Giovanni, Nicola and Vito Amoruso (the "Amorusos"), Italian subjects who are engaged in the commercial fishing business. The defendants are Fisheries Development Corp. ("FDC"), a New York corporation with its principal place of business in New York, and Raymond E. Gerson ("Gerson"). He is the chief executive officer and principal stockholder of FDC and all its officers, directors and stockholders are citizens of the United States.

### A. *The Master Agreement*

In December 1978, after extensive negotiations conducted in New York City, FDC and the Amorusos entered into an agreement (the "Master Agreement") to engage in a joint venture pursuant to which they established a general partnership called "Amfish." The Amorusos' interest in the general partnership was in the name of Amfish, Ltd., a New York corporation that they wholly owned. All its officers and directors but one are United States citizens. The Amfish general partnership was divided into a 75% interest for FDC and a 25% interest for Amfish, Ltd. FDC was designated the managing general partner of Amfish.

The Master Agreement provides, among other matters, that Amfish, the general partnership, was to construct and operate three American–built fishing vessels to fish for squid and other fish in the United States fishery conservation zone available to American citizens under the Fishery Conservation and Management Act of 1976 ("Fishery Act").[1] The Amorusos agreed that when the Amfish vessels were in operation they would purchase the entire catch of the vessels.

At the time the agreement was entered into, the Amorusos were owners of three fishing trawlers documented under the laws and flag of the Republic of Italy. Pending the construction of the Amfish vessels by the Amfish partnership, the agreement provided that FDC would use its best efforts to obtain federal legislation (the "Legislation") creating an exception to the restrictions imposed on foreign fishing by the Fishery Act. The Legislation would permit the three Amoruso vessels to fish for squid in United States waters and land their catch in the same manner as if they were American vessels until such time as the Amoruso vessels could be replaced by the Amfish vessels, whereupon any rights acquired by an Amoruso vessel as a result of such Legislation would be terminated. The agreement was to continue in force for a period of 15 years unless the Legislation was not enacted by the adjournment of the 96th Congress at the end of 1979. In the event the Legislation were enacted, the Amorusos were given the right to terminate the agreement within 90 days of its passage upon a good faith determination that performance under the Legislation as enacted was commercially unreasonable.

FDC also agreed to attempt to obtain additional fishing rights for the Amorusos–including the right to continue fishing even after the Amfish vessels were constructed and in operation–but this additional legislation was not made a prerequisite to the continued vitality of the agreement.

The agreement provided that, prior to the enactment of the Legislation, FDC would advance $77,500 to Amfish and the Amorusos would advance $102,500, the funds to be paid in two installments. FDC also had the right to require that each partner contribute up to an additional $50,000 to Amfish. Until the Legislation was obtained, the funds were to be used solely to form and operate Amfish, to pay the salaries of Gerson and his staff, and to construct Amfish vessels.

Once the Legislation was enacted and the Amoruso vessels began fishing in American territorial waters, the Amorusos were required to make capital contributions to Amfish: an initial contribution of $250,000 upon the effective date of the Legislation;

---

1. 16 U.S.C. §§ 1801 et seq.

plus payments during the first year totalling $1,050,000; payments during the next two years of at least $1,300,000 at a rate of $210 per metric ton of all fish caught by the Amoruso vessels except mackarel and silver hate; and payments thereafter at a rate of $160 per metric ton. The purpose of this funding was to supply additional capital required in the construction of the Amfish vessels. The contributions were to cease if fishing rights of the Amoruso vessels were terminated. Upon liquidation of the partnership, capital contributions to the extent made were to be repaid after repayment of advances for start–up costs but before any distributions of profits based on the parties' equity interests. No capital contributions were required of FDC beyond the initial advances.

That the parties were acutely sensitive to compliance with the United States laws and in particular with the Foreign Agents Registration Act ("FARA")[2] is evident from their respective representations that, subject only to the effectiveness of the Legislation, the execution and consummation of the agreement would not violate any law, order, rule or regulation of any government or governmental authority. The agreement noted that FDC had requested an opinion from the United States Department of Justice as to what action, if any, was required of it to comply with FARA and that FDC agreed to comply with its provisions. Finally, the agreement contained a provision that "[a]ny and all differences or disputes of whatever nature arising out of this Agreement shall be put to arbitration in the City of New York pursuant to ... the laws of the State of New York."

### B. *The Increase Agreement*

By May 1979, the Legislation had not been passed. FDC and the Amorusos then entered into an additional agreement (the "Increase Agreement") whereby FDC un-dertook to use its best efforts to obtain from the Department of State an increased allocation to the Republic of Italy for squid fishing in American waters, some portion of which might in turn be allocated to the Amorusos.[3] The Amorusos undertook to fish for squid under any such increase and to make additional capital contributions to Amfish of $150 per ton of squid thus caught. In the event the increase was granted and the Amorusos fished under its terms, FDC further agreed to use its best efforts to obtain increases for successive six–month periods until the Amorusos were permitted to commence fishing under the Legislation. The Increase Agreement incorporated by reference the original Master Agreement, including its disposition of capital contributions upon liquidation and its arbitration provision. The Increase Agreement provided, however, that the Master Agreement would not terminate as long as the increase was in effect.

Between December 1978 and December 1979, the Amorusos allege they advanced not less than $154,678 to Amfish pursuant to the Master and Increase Agreements. The defendants dispute that any capital contributions were made by the Amorusos; apparently, they contend that the sums were advanced, as required by the Master Agreement, for expenses, including salaries, incurred in the formation and operation of Amfish.

On September 19, 1979, Gerson testified before the House Subcommittee on Fisheries and Wildlife Conservation and the Environment in support of H.R. 4360, the Underutilized Species Development Act of 1979, which would have authorized ventures similar to Amfish. Gerson fully informed the Subcommittee of his relation to the Amorusos and of the nature of the partnership established by the agreements. The thrust of his testimony was the beneficial impact of the proposed legislation upon the

---

**2.** 22 U.S.C. §§ 611 et seq.

**3.** Section 1821(e) of the Fishery Act authorizes the Secretary of State, in cooperation with the Secretary of Commerce, to allocate among foreign nations the right to fish for specified amounts of fish that are subject to the exclusive fishery management authority of the United States as defined in section 1812 of that Act. 16 U.S.C. §§ 1812 & 1821(e).

American fishing and shipbuilding industries. Although H.R. 4360 was never enacted, increases in the allocation of fishing became available to the Amorusos.

On April 18, 1980, FDC, claiming to act pursuant to the agreements' arbitration clause, served upon the Amorusos a "demand for arbitration" before the American Arbitration Association for sums allegedly due for operating expenses under the Master Agreement and capital contributions under the Increase Agreement. The date for the arbitration was initially postponed at the Amorusos' request but the defendants refused further postponement and sought to have the arbitration commence in July or August of 1980. The Amorusos thereupon brought this action.

■ The only affidavit submitted in support of the motion declaring the agreements void and illegal is that of current counsel for the Amorusos, who did not represent the Amorusos at the time the agreements were negotiated and signed. The affidavit abounds in hearsay statements and counsel's interpretation of various provisions of the agreements and acts performed under its terms; finally, it charges that there was a serious violation of federal law and that the opposing affidavit of Gerson, who was a party to the negotiations and took various actions under the agreements, contains "a series of misstatements, half–truths and omissions." Significantly, although several adjournments of the motions were granted, in part to afford the individual plaintiffs an opportunity to submit their own affidavits, they have failed to do so. This failure to submit sworn statements of any plaintiff with personal knowledge of the negotiation and consummation of the contracts and of subsequent events is even more significant in light of present counsel's suggestion that plaintiffs were

hapless Italian nationals who were overreached by defendants, as hereafter described. No affidavit has been submitted by any member or associate of the law firm that then represented plaintiffs nor has any explanation been offered for its absence.[4] Thus the affidavit of current counsel with its accusatory and hearsay statements is entitled to little, if any, weight.[5] The disposition of the respective motions is based upon the written agreements, documents and other material as to which there is no dispute and the applicable statutes.

The Amorusos' motion for a declaratory judgment challenges the agreements as illegal or contrary to public policy on three grounds: the agreements violate the contingent fee proscription of FARA; the agreements violate the common law rule against fees contingent on success in political lobbying; and the arbitration provision of the agreements is invalid because the Fishery Act reserves exclusive jurisdiction of cases arising under it to the federal courts.

Plaintiffs also assert a claim that the agreements as a whole are void as fraudulently induced by defendants' false representations that their conduct would not violate any provision of law. Plaintiffs allege an additional claim that they did not speak English, were unfamiliar with the American judicial system or the effect of an arbitration clause, were not advised by defendants that it foreclosed a judicial trial with its incidents such as pre–trial discovery and a jury right, and did not intend to waive these rights. While not clearly articulated as a claim of fraud in the inducement of the arbitration clause, such is the thrust of the claim.

## II.   The Appropriate Forum

■ In light of the arbitration clause contained in the agreements under attack, a

---

4.  *Harris v. Commissioner*, 461 F.2d 554, 556 (5th Cir. 1972) (failure of litigant's counsel with personal knowledge of contractual negotiation to testify gives rise to inference that his testimony would have been unfavorable to his clients).

5.  *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1365 (S.D.N.Y.

1978); *Christophides v. Porco*, 289 F.Supp. 403, 407 (S.D.N.Y.1968); *see, e. g., Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950); *Union Ins. Soc. of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 952 (2d Cir. 1965).

threshold question is whether plaintiffs' various claims are for resolution by the arbitrators or by the courts. The Court finds that in this case judicial determination is required.

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,[6] the Supreme Court held that, in cases brought in federal court involving arbitration provisions in contracts evidencing a "maritime transaction" or a "transaction in commerce," federal law is to govern their validity, enforceability and interpretation despite, as is found in the agreements at bar, a contrary choice of law provision in the arbitration clause.[7] The agreements at issue reflect both a maritime transaction and a transaction in commerce as defined in Section 1 of the Arbitration Act.[8] Federal law thus governs the instant dispute.[9]

■ The holding of *Prima Paint* is that "a claim of fraud in the inducement of the contract generally—as opposed to the arbitration clause itself—is for the arbitrators and not for the courts."[10] Thus the claim of fraud insofar as it addresses the arbitration clause itself is for the Court's determination. There remains the separate charge of fraud with respect to the agreements as a whole, which upon a casual reading of *Prima Paint*, would appear to be for the arbitrators' determination. However, the arbitration provision in that case, which encompassed any controversy or claim "arising out of or relating to this agreement," was described by the court as a "broad arbitration clause."[11] Here the clause is limited to differences or disputes "arising out of this Agreement"; notably, it omits reference to disputes "relating to" the agreements. The omission is significant in the Second Circuit. In *In re Kinoshita & Co.*,[12] the court ruled that while the inclusion in an arbitration agreement of the phrase "relating to," or words of like import, requires the issue of fraud in the inducement of the basic agreement, as opposed to the arbitration clause itself, to be resolved by the arbitrators and not the courts,[13] an arbitration provision, like the one in these agreements, restricted to disputes "arising out of" the contract did not encompass a dispute over its fraudulent inducement and hence was to be resolved by the court.[14] The rule of *Kinoshita* was later interpreted to include claims of illegality: under an arbitration clause substantially similar to the one at bar, it has been held that the alleged illegality of a contract is an issue not for an arbitrator but for the court.[15] Thus, the claims of fraud as well

---

**6.** 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

**7.** *Id.* at 399–405; *see Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 406–09 (2d Cir. 1959), *cert. dismissed*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *Avila Group, Inc. v. Norma J. of Calif.*, 426 F.Supp. 537, 540 (S.D.N.Y.1977).

**8.** 9 U.S.C. § 1; *see, e. g., Harbor Island Spa, Inc. v. Norwegian America Line A/S*, 314 F.Supp. 471, 473 (S.D.N.Y.1970); *El Hoss Engineering & Transport Co. v. American Indep. Oil Co.*, 183 F.Supp. 394, 397 (S.D.N.Y.1960), *rev'd on other grounds*, 289 F.2d 346 (2d Cir.), *cert. denied*, 368 U.S. 837, 82 S.Ct. 51, 7 L.Ed.2d 38 (1961).

**9.** The defendants' claim that the Amorusos have waived their right to contest arbitration under N.Y. C.P.L.R. § 7503(c) by failing to respond within 20 days to the notice of intention to arbitrate served upon them is therefore of no avail. There is no time limit for such response under federal law comparable to that imposed by New York law. *See Rothberg v.*

*Loeb, Rhoades & Co.*, 445 F.Supp. 1336, 1339 (S.D.N.Y.1978).

**10.** 388 U.S. at 400, 87 S.Ct. at 1804.

**11.** *Id.* at 398, 87 S.Ct. at 1803.

**12.** 287 F.2d 951 (2d Cir. 1961).

**13.** *E. g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406, 87 S.Ct. 1801, 1807, 18 L.Ed.2d 1270 (1967).

**14.** 287 F.2d at 953; *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 n.8, 87 S.Ct. 1801, 1805 n.8, 18 L.Ed.2d 1270 (1967) (citing *Kinoshita* with approval); *Pollux Marine Agencies, Inc. v. Louis Dreyfus Corp.*, 455 F.Supp. 211, 219 (S.D.N.Y.1978) (same).

**15.** *American President Lines, Ltd. v. S. Woolman, Inc.*, 239 F.Supp. 833, 835–36 (S.D.N.Y. 1964). The arbitration clause in *Woolman* applied to "any disputes between the parties hereto arising out of this agreement involving the interpretation and effect thereof."

as the alleged illegality of the agreement must now be addressed.[16]

## III. *Foreign Agents Registration Act*

■ The Amorusos contend that the agreements are illegal and unenforceable because they contravene a provision of FARA that proscribes the payment of fees that are contingent on the success of political lobbying. The defendants deny that the FARA provision applies to them. The Court finds that the defendants' view prevails.

Section 618(h) of FARA provides:

It shall be unlawful for any agent of a foreign principal required to register under this subchapter to be a party to any contract, agreement, or understanding, either express or implied, with such foreign principal pursuant to which the amount of payment of the compensation, fee, or other remuneration of such agent is contingent in whole or in part upon the success of any political activities carried on by such agent.[17]

By its terms, section 618(h) applies only to agents of foreign principals required to register under FARA.

Section 611(b) defines a "foreign principal" to include in relevant part: "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." [18] Section 611(c) defines an "agent of a foreign principal" to include in relevant part:

any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person—

engages within the United States in political activities for or in the interests of such foreign principal; [or]

. . . . .

within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States.[19]

The Amorusos maintain that they are "foreign principals" and that the defendants were their agents because the defendants acted at the request of the Amorusos, their activities were financed and subsidized by the Amorusos, and they engaged within the United States "in political activities for or in the interests of the Amorusos." The Amorusos also contend that the

---

**16.** Having determined that the present arbitration clause is of insufficient breadth to require that claims of illegality be determined by arbitration, it is unnecessary to consider the Amorusos' further contention in reliance on *American Safety Equipment Corp. v. J. P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968), that the subject matter of the dispute at hand, raising as it does issues of public policy and alleged violations of law, is inappropriate for a nonjudicial forum.

**17.** 22 U.S.C. § 618(h).

Section 611(*o*) of FARA defines "political activities" to mean any activity that a person "intends to [ ] prevail upon, indoctrinate, convert, induce, persuade, or in any other way influence any agency or official of the Government of the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States." While Gerson's testimony before the House Subcommittee and his activities before the Department of State

with respect to an increase of the allocation of fishing rights to the Government of Italy may come within the definition, no court decisions have passed upon the scope of the term "political activity." The provision was the subject of much discussion before the Senate Committee on Foreign Relations, with the Chairman of the Committee during the course of extended argument stating his view that "[i]t is activities attempting to influence policymaking that we are trying to reach" and that "coming in to the committee and seeking to have a law passed in favor of your client . . . is clearly a political activity." *FARA Amendments: Hearing on S.693 Before the Senate Committee on Foreign Relations*, 89th Cong., 2d Sess. 9, 18 (1965) (Senator J. W. Fulbright, Chairman) [hereinafter "*FARA Hearings*"].

**18.** 22 U.S.C. § 611(b)(3).

**19.** 22 U.S.C. § 611(c)(1)(i) & (iv).

defendants acted as agents for the Italian Government in seeking to obtain an increased allocation of fishing rights under the Increase Agreement.

■ The defendants dispute that they meet the definition of agents of a foreign principal under FARA. Such agents must, according to section 611(c)(1), act "at the order, request, or under the direction or control, of a foreign principal," either directly or indirectly. The term "control" and its variants are defined to include "the possession or the exercise of the power, directly or indirectly, to determine the policies or the activities of a person, whether through the ownership of voting rights, by contract, or otherwise."[20] The Amorusos, through Amfish, Ltd., held only a 25% share in the Amfish partnership, an amount that did not permit them to exercise control of the partnership when confronted with the 75% share of FDC.[21] Moreover, FDC's position as managing partner kept the Amorusos from exercising de facto control. Nor is this result changed by the provisions of the agreement requiring the Amorusos to make capital contributions to Amfish. Even the receipt of a bona fide subsidy from a foreign source does not render the recipient an agent of that source as long as the recipient is not subject to foreign direction or control.[22] Neither FDC nor Gerson were therefore subject to the control of the Amorusos. A fair reading of the agreements compels the conclusion that Amfish, formed as an American general partnership for the construction and operation of American–built vessels, was under the management, direction and control of Gerson, its designated general managing agent and the principal stockholder of FDC.

■ The further claim that defendants were the agents of, and acted under the direction and control of, the Italian Government with respect to increased allocation of fishing quotas, is devoid of substance. Although the Republic of Italy may have benefitted as a result of the defendants' efforts, there is not a shred of evidence that the defendants had any contact with the Italian Government or were in any way subject to its control. Since the defendants were not agents of foreign principals as defined in FARA they are not subject to its terms.[23]

### IV. Common Law Contingent Fee Claim

■ The Amorusos contend that even if the defendants are beyond the pale of FARA, nonetheless the agreements are void because they violate the common–law proscriptions against contingent fee arrangements for political activities. The defendants dispute that any compensation, fee or remuneration is payable to either of them that is dependent upon passage of the Legislation. Analysis of the agreement supports the defendants' position.

The initial advances by the Amorusos and FDC to Amfish for expenses and other items enumerated in the Master Agreement were not, in any respect, dependent upon the passage of the Legislation. Those advances were payable regardless of the fate of the Legislation. The use of those funds

---

20. 28 C.F.R. § 5.100(b). Amfish, as a partnership, qualifies as a "person" under FARA. 22 U.S.C. § 611(a).

21. The agreement itself refers to a 75%–25% split "of the control of, and power and authority over, Amfish."

22. 1966 U.S. Code Cong. & Ad.News 2397, 2401.

23. An opinion letter from the Internal Security Section of the Criminal Division of the United States Department of Justice requested by the defendants' law firm pursuant to 28 C.F.R., section 5.2 lends further support to the conclusion that the defendants do not come within the definition of a "foreign principal" or that of an "agent of a foreign principal" under FARA. Although the Justice Department opinion was requested to determine whether the law firm was required to register, the Department was apprised of the relevant facts concerning the defendants so that its opinion in their regard was informed.

Since it is concluded that defendants are not agents of a foreign principal, it is unnecessary to consider defendants' further claim that even if they were found to be agents of a foreign principal, they would, nonetheless, fall within specific exemptions to the registration requirements under § 613(d).

was solely for the benefit of Amfish, an American enterprise formed under New York State law in which plaintiffs had a 25% interest and defendants a 75% interest. In no respect can these advances for the operation of Amfish, the partnership, be construed as a contingent fee, payment or compensation.

The only aspect of the agreements that relates to the passage of the Legislation is the obligation of the Amorusos to make capital contributions already discussed. These were required in the event the Legislation were enacted or an increased allocation of fishing rights were secured, although the Amorusos retained an option to cancel the agreements if they deemed the Legislation commercially unreasonable. These contributions, just as the advances, were to be made not to the defendants but to the parties' joint enterprise, the Amfish partnership.

The Master Agreement is explicit that Amfish was formed to construct and operate American–built vessels for the purpose of fishing in American territorial waters.[24] The passage of the Legislation would have triggered the partial financing required to advance the prospect of Amfish. The plaintiffs do not dispute the defendants' allegations that, pending construction of these vessels, a purpose of the Legislation was to provide Amfish, through the sale of fish caught by the Amoruso vessels as would have been authorized under the Legislation, with a portion of the required funds for the Amfish operation and to provide a means of training American crews. The activities of the defendants in seeking to obtain the Legislation or an increased allocation of fishing quotas, if successful, would not have yielded any compensation to FDC or Gerson. It may be acknowledged that had the Legislation been enacted, FDC, and Gerson as its principal shareholder, could have benefitted since the capital contributions required of the plaintiffs, if made, would have given to Amfish the viability and financing essential to its contemplated fishing and shipbuilding activities, but that prospect did not transmute the capital contributions into payments to any of the parties for "political activity in procuring passage of the Legislation." To refer to the capital contributions to be made to Amfish if the Legislation were enacted or the increased allocation were secured, as plaintiffs do, as compensation or contingent fees to either defendant is to ignore or distort the agreements. In sum, the agreements do not provide for any "compensation, fee or other remuneration" to FDC that is contingent upon the success of political activities.

■ But even were it assumed, arguendo, that as the Amorusos contend, the capital contributions were contingent fee payments to defendants, plaintiffs cannot prevail. Plaintiffs cite several cases invalidating fees contingent on the procurement of favorable legislation regardless of any purpose to corrupt or mislead legislators.[25] Although these cases have not been specifically overruled, a line of more recent cases hold that only the use of personal influence and sinister means will avoid a contract.[26] Sound First Amendment considerations lie behind this latter set of cases.[27] Gerson's testimony before the House Subcommittee consisted solely of entirely proper arguments on the merits. His advocacy of legislation that he believed would have a beneficial impact upon American shipbuilding and fishing industries and of an increased allocation of fishing rights, as well as his agreement with the Amorusos to engage in this

---

**24.** The plaintiffs, in an attempt to overcome this undeniable fact, assert "that no such vessels were ever built." That the venture did not succeed does not refute the underlying purpose of Amfish.

**25.** See, e. g., Gesellschaft Fur Drahtlose Telegraphie M.B.H. v. Brown, 78 F.2d 410, 412 (D.C. Cir.), cert. denied, 296 U.S. 618, 56 S.Ct. 139, 80 L.Ed. 439 (1935).

**26.** See, e. g., Troutman v. Southern Ry. Co., 441 F.2d 586, 589 (5th Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); Racquet Club, Inc. v. Lipper, 373 F.2d 753, 754 (1st Cir. 1967).

**27.** See Troutman v. Southern Ry. Co., 441 F.2d 586, 589 (5th Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

advocacy, did not offend public policy and was a valid exercise of his constitutional right to associate and to petition his government.[28] No evidence of impropriety, contemplated or actual, has been demonstrated. Because the illegal or sinister nature of a contract will not be presumed, the burden of demonstrating illegality is on the party asserting it.[29] The Amorusos have not met this burden.[30]

## V. The Fishery Act

The Amorusos also argue that the arbitration agreement is null and void because it divests the United States District Courts of exclusive jurisdiction over cases arising under the Fishery Act.[31] Insofar as this provision was meant to establish federal jurisdiction vis–a–vis the state courts, it is not a bar to arbitration.[32] The Fishery Act provision was, however, enacted in part to avoid the problem arising when the courts of foreign nations fail to enforce allocations of fishing rights made by the Secretary of Commerce.[33] The Act contemplates enforcement by arrest and seizure of any fishing vessel engaged in violations of its terms. Congress intended that all enforcement activity should be vested in the federal district courts; the exclusive jurisdiction provision is entirely unrelated to a contract dispute between private parties.[34] No reasons exist, therefore, for construing the "exclusive jurisdiction" provision of section 1861(d) not to permit arbitration of this dispute.

Moreover, the dispute at hand does not fall "under" the Fishery Act. Part of the test for whether a claimed right falls "under" a federal statute is that the claim will be supported if the statute is given one construction and defeated if it is given another.[35] The Amorusos' claims do not in any respect involve a construction of the Fishery Act; they arise under the agreements. Resolution of them by arbitration thus does not run afoul of the exclusive jurisdiction provision of section 1861(d).

## VI. The Fraud Claims

The defendants have also moved for summary judgment on the issue of fraud. The plaintiffs allege that the Amorusos did not speak English, were unfamiliar with the meaning of arbitration or the American judicial system, and were not advised by the defendants of the rights they were waiving by entering into an arbitration agreement. The claim is without evidential support. It is undisputed that during the course of the negotiations leading to the execution of the Master Agreement in December 1978 and the Increase Agreement in May 1979 and even up to the eve of the commencement of the arbitration proceeding by defendants, plaintiffs were represented by one of the nation's leading admiralty and maritime firms, particularly experienced in ship financing matters; that one of the plaintiffs participated in the negotia-

---

28. *See Eastern Railroad Pres. Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–38, 81 S.Ct. 523, 528–29, 5 L.Ed.2d 464 (1961); *Troutman v. Southern Ry. Co.*, 441 F.2d 586, 589 (5th Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

29. *Steele v. Drummond*, 275 U.S. 199, 205, 48 S.Ct. 53, 54, 72 L.Ed. 238 (1927).

30. Although there are no cases construing the specific contingent fee prohibition of section 618(h) of FARA, there is no reason to believe that Congress intended this prohibition to differ significantly from the common law rule. Indeed, there is evidence that FARA too was directed at illicit lobbying activity. *See FARA Hearings* at 22 (Senator Hickenlooper) ("I think what we are trying to reach are these surreptitious gumshoes that slip around cocktail parties and the back door of some offices, and this,

that, or the other thing.") Even, therefore, if it were assumed that FARA did apply to the defendants, the agreements would not be prohibited by section 618(h).

31. *See* 16 U.S.C. § 1861(d).

32. *See Bache Halsey Stuart Inc. v. Rowady*, 437 F.Supp. 1075 (N.D.Ill.1977) (construing similar Securities Act provision).

33. 1976 U.S. Code Cong. & Ad.News 593, 595, 610.

34. *Id.*

35. *Gully v. First Nat'l Bank in Meridan*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936).

tions in New York City with translators available at his command; that before execution of the Master Agreement, he took it to Italy for the express purpose of having it translated and reviewed by him and his brothers, following which it was executed by them and returned to the defendants. This was also true of the Increase Agreement which was executed some four or five months after the Master Agreement. Moreover, as previously noted, although the Amorusos were afforded an opportunity to support this fraud claim by factual averments of the parties who negotiated the agreements and allegedly were overreached, no such affidavits have been submitted. Despite, therefore, the Amorusos' counsel's portrayal of plaintiffs as naive fishermen unfamiliar with the English language, it is quite apparent that they are sophisticated and substantial businessmen who during the course of the transactions at issue were represented by competent counsel and apprised of key developments in translation. This fraud claim must thus be dismissed as unsubstantiated.

The plaintiffs also allege that the agreements as a whole were induced by fraud because of the defendants' allegedly false representation that their conduct under the agreements would be lawful. In light of the plaintiffs' failure to establish that either the agreements or the defendants' conduct under the agreements was illegal, their claim of fraud also fails. This disposition is underscored, as previously noted, by the Amorusos' representation by experienced counsel.

VII. *Conclusion*

The plaintiffs' motion for summary judgment declaring the Master and Increase Agreements illegal and unenforceable is denied; their alternative motion to enjoin the arbitration proceeding is denied; the defendants' cross–motion to dismiss plaintiffs' complaint is granted and their cross–motion that the arbitration proceed according to the terms of the arbitration clause contained in the agreements is granted.

So ordered.