I wrote the original opinion that was released March 7, 1997. That opinion affirmed the trial court's order compelling arbitration of the Isbells' claims. Justices Maddox, Houston, and See concurred in my opinion. Justice Butts concurred in the result. That opinion did not state that the Isbells had no valid claim, nor did it say that Southern had a defense to the Isbells' claims. It simply stated that the parties must arbitrate the dispute in accordance with the arbitration agreement contained in the installment sales contract with American Housing. Since March 7, 1997, the Court has changed its mind. The reason for such a radical change is the fact that the legal status of arbitration in the State of Alabama is, to put it mildly, in a state of flux. The majority opinion helps to clarify the status of arbitration agreements; however, I am afraid that clarification is in the wrong direction. That is why I write this dissent.
 I. The Language Agreed to by the Isbells
I must admit that there is some very thorough research in the majority opinion. Justice Cook has carefully studied the federal cases that deal with enforcement of arbitration agreements by nonsignatories. However, in the opinion I find a flaw, upon which I am compelled to focus. After giving a lengthy discussion of those federal cases, the opinion states: "Finally, and most fundamentally, we hold that the arbitration provisions in this case are not broad enough to include the claims against Southern." Majority Op. at 581. Fundamental is right. There is nothing more fundamental in a contract dispute than the language of the contract. The language of an arbitration agreement in a contract determines whether a dispute arising under the contract must be arbitrated.[2] The language illustrates the intent of the parties. Here is the arbitration provision:
 "17. ARBITRATION: All disputes, claims, or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration by one arbitrator selected by Assignee with consent of Buyer(s). This arbitration Contract is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U.S.C. § 1. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right or opportunity to litigate disputes through a court, but they prefer to resolve their disputes through arbitration, except as provided herein. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY ASSIGNEE (AS PROVIDED HEREIN). The parties agree and understand that all disputes arising under case law, statutory law, and all other laws including, but not limited to, all contract, tort, and property disputes, will be subject to binding arbitration in accord with this Contract. The parties agree and understand that the arbitrator shall have all powers provided by the law and the Contract. These powers *Page 583 
shall include all legal and equitable remedies, including, but not limited to, money damages, declaratory relief, and injunctive relief. Notwithstanding anything hereunto to the contrary [sic], Assignee retains an option to use judicial or nonjudicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home. Such judicial relief would take the form of a lawsuit. The institution and maintenance of an action for judicial relief in a court to foreclose upon any collateral, to obtain a monetary judgment, or to enforce the security agreement shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration in this Contract, including the filing of a counterclaim in a suit brought by Assignee pursuant to this provision."
The fundamental question this Court must decide is: To what did the Isbells agree? Using standard contract principles, do we conclude that they agreed to be bound by the arbitration provision to arbitrate disputes with nonsignatories? How much broader can the language be? It does not matter whether this issue was raised before this Court in Ex parte Gates,675 So.2d 371 (Ala. 1996). This Court addressed the question of the broad language of the arbitration clause in Gates and determined that it was broad enough to allow for the nonsignatory to compel arbitration in reference to the Gateses' claims.[3] This Court has confirmed the rationale of Gates in at least one other case.[4]
What more need this Court say? This Court has the opportunity to review this type of broad language again, and it should construe it to allow Southern Energy to compel arbitration of this dispute.[5]
The Isbells agreed to arbitrate all disputes arising from or relating to "the relationships which result from this Contract." What does that mean? What relationships could the clause refer to? Does it refer to family relationships? The word "relationships" does not refer to the brother of the salesman for American Housing. The word "relationships" has a contextual meaning that protects *Page 584 
the Isbells from agreeing to any conceivable relationship possible. The word "relationships" can refer only to the commercial relationships that arose from this particular sale of a mobile home to the Isbells. It would not refer to American Housing; the Isbells do not contest American Housing's right to arbitrate. What other relationships arose from this contract? The relationship with the manufacturer arose from this contract. So did the financing arrangement with Green Tree. Any expansion beyond these companies of the right to compel arbitration would be suspect even to me. But unless the majority is arguing that the language "or the relationships which result from this Contract" is entirely meaningless, it appears that it easily and logically applies to Southern Energy Homes. This Court and the federal courts have held that, in the context of an arbitration agreement, the use of the phrase "arising under" requires a narrower application of the arbitration agreement than the use of the phrase "arising under and relating to."[6] How did the Isbells, who agreed to the language, interpret it when they read that phrase? Did they ignore it? Did they think it did not apply to the manufacturer of the home they were purchasing? To what relationships did they think it applied?
Even if the arbitration clause was ambiguous, and it is not, it should be construed in favor of arbitration.Allied-Bruce Terminix Companies v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).
The majority's opinion implies that one cannot agree to arbitrate a dispute with a nonsignatory. Why not? I can agree with another to perform a service that benefits a third party. In certain situations, that third party can compel my performance of that service even though that party was not a party to the contract.[7] If the case involved a signatory's attempting to compel a nonsignatory to arbitrate, it would be clear that the nonsignatory did not agree to the arbitration. However, the signatories in this case, the Isbells, agreed to arbitrate. It is not a question of what Southern Energy intended; it is a question of what the Isbells intended. They intended to arbitrate "[a]ll disputes . . . arising from or relating to . . . the relationships which result from this Contract." Notwithstanding all the federal case analysis in the majority opinion, the language of this arbitration agreement is exceedingly broad, and the Isbells agreed to be bound by that language. That language includes nonsignatories like Southern Energy.
The majority relies on only one federal district court case that has facts that are on point with the facts in this case. See Wilson v. Waverlee Homes, Inc., 954 F. Supp. 1530 (M.D.Ala. 1997). The FAA favors arbitration, and the federal courts have allowed nonsignatories to an arbitration agreement to compel arbitration with signatories. Southern Energy is not far removed from the transaction between American Housing and the Isbells. It certainly falls within a relationship "which result[s] from [the] Contract." Considering the weight of authority from the federal circuit courts of appeals favoring a nonsignatory in close relationship with the signatories to an arbitration agreement, I find it odd that this Court would follow the single decision of a federal district court.
In order to reach the result in this case, the majority ignores the language of the arbitration provision agreed to by the Isbells and simply states that paragraph 17 must be readin pari materia with paragraph 16. But the relationship between the Isbells and Southern Energy arose from the contract between the parties mentioned in paragraph 16. Therefore, according to the agreement entered into by the Isbells, any dispute with Southern Energy is subject to arbitration.
 II. Limited Warranty
The Isbells argue that the "One Year Limited Warranty" from Southern Energy, *Page 585 
which disclaims all warranties not expressly made by Southern Energy, also disclaims Southern Energy's right to compel arbitration based on the arbitration agreement printed on the back of the sales contract. The Isbells cite a portion of the warranty:
 "Southern Energy Homes, Inc. is not liable for any agreement or commitment made by any employee, dealer or agent other than those expressly set forth in this warranty."
The express warranty must be viewed in context. The express limited warranty is entitled "One Year Limited Warranty." All of the provisions in that document deal exclusively with problems that may arise with the mobile home after the sale. The warranty is a promise by the manufacturer, in which it assures the buyer that it will be liable for certain enumerated defects. The warranty is also a limiting document, informing the buyer that it will not be liable for defects that are not listed in the document, nor for any promises or agreements made outside the sales contract that would place liability upon Southern Energy.
Understanding what matters are addressed in the warranty is important to understanding what is not addressed in the warranty. Nothing in the "One Year Limited Warranty" addresses how the manufacturer will be paid, or how many days the manufacturer will have to deliver the product, or how to resolve a dispute between the parties. The parties must address these topics, as well as others, in the normal course of business. Other documents will bind the parties to certain actions in this transaction. The wording of the "One Year Limited Warranty" deals only with who will be responsible for defects discovered in the product after purchase. Thus, the language cited by the Isbells merely informs the parties that no "agreement or commitment," oral or written, will be honored except those agreements or commitments expressly set forth in this particular warranty. To hold that Southern Energy is not bound by the arbitration agreement contained in a separate document because of restrictive language in the limited warranty would essentially allow Southern Energy to escape responsibility for every promise not specifically delineated in the "One Year Limited Warranty." Such a holding would mock contract law, not follow it. The limited warranty deals with warranties and with limits upon Southern Energy's liability, and nothing more.
 III. Conclusion
The agreement between the Isbells and American Housing governs the applicability of arbitration to the dispute with Southern. It is clearly broad enough to govern the issue. Courts should not so lightly do away with legitimate contracts like the one in this case. Our law requires that courts uphold contracts, that our government may be "a government of laws and not of men." Ala. Const. of 1901, § 43.
MADDOX, HOUSTON, and SEE, JJ., concur.
[2] "The language of the contract entered into by the parties determines whether a particular dispute should be submitted to arbitration under the contract." Capital Investment Group, Inc.v. Woodson, 694 So.2d 1268, 1270 (Ala. 1997). See also Koullasv. Ramsey, 683 So.2d 415, at 417 (Ala. 1996), stating that in determining "whether the arbitration clause applies to this dispute, we must consider the intent of the parties, as it is expressed in the language of the . . . contract."
[3] In Gates, this Court wrote:
 "Did the trial court properly compel arbitration? The answer to that question is a matter of contract interpretation, which is guided by considering the intent of the parties to the mobile home sales contract. Thus, the essential question is whether the arbitration clause in that contract applies to the Gateses' claims. . . .
 "The arbitration clause . . . is very broad; it provides that '[a]ll disputes, claims, or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration.' "
675 So.2d at 374.
[4] Ex parte Martin, 703 So.2d 883 (Ala. 1996):
 "To determine the scope of that arbitration clause, the Gates Court first noted that the issue was a matter of contractual interpretation, to be resolved by considering the intent of the parties to the agreement. Gates at 374. The Court recognized that the language of the arbitration clause was particularly broad, encompassing not only the 'disputes, claims, or controversies arising from' the contract, but also 'the relationships' that resulted from it. The Court concluded, based upon the agreement's expansive language as it applied to the plaintiffs' claims, that the trial court had properly determined that the claims against Palm Harbor were arbitrable, despite the fact that Palm Harbor had not signed the agreement containing the arbitration clause.
 "The arbitration clause in Gates clearly contemplated arbitration of claims brought by the signatories to the agreements and also arbitration of claims brought by other, unnamed parties, if those claims arose from or related to the contract or the 'relationships' that resulted from the contract."
703 So.2d at 886. (Emphasis added.)
[5] The majority opinion discusses several federal cases dealing with nonsignatories to arbitration agreements. E.g., SunkistSoft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 755
(11th Cir. 1993), cert. denied, 513 U.S. 869, 115 S.Ct. 190,130 L.Ed.2d 123 (1994), and McBro Planning Dev. Co. v.Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984). Neither of these cases quoted language from the arbitration clauses at issue regarding relationships resulting from the contract. If the federal courts found a sufficient connection between the nonsignatory and the contract to compel arbitration in those cases, how much more clearly should this Court find a relationship in this case, in which the arbitration clause is apparently so much broader than the clauses in those cases?
[6] See Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala. 1994); Prima Paint Corp. v. Flood Conklin Mfg. Co.,388 U.S. 395, 398, 87 S.Ct. 1801, 1803, 18 L.Ed.2d 1270 (1967);Mediterranean Enterprises, Inc. v. Ssangyong, 708 F.2d 1458
(9th Cir. 1983); In re Kinoshita Co., 287 F.2d 951 (2d Cir. 1961); Michele Amoruso E Figli v. Fisheries Dev. Corp.,499 F. Supp. 1074 (S.D.N.Y. 1980); Sinva, Inc. v. Merrill Lynch,Pierce, Fenner Smith, Inc., 253 F. Supp. 359 (S.D.N Y 1966).
[7] See Ex parte ReLife, Inc., 679 So.2d 664 (Ala. 1996).