**LOCAL NO. 725, INTERNATIONAL UNION OF OPERATING ENGINEERS, Petitioner,**

v.

**STANDARD OIL COMPANY OF INDIANA, a Corporation, Respondent.**

**Civ. No. 288.**

United States District Court
D. North Dakota,
Southwestern Division.

Sept. 12, 1960.

Charles L. Murphy, of Higgins & Murphy, Bismarck, N. D., for petitioner.

Myron H. Atkinson, Jr., of Cox, Pearce & Engebretson, Bismarck, N. D., and Stark Ritchie, Chicago, Ill., for respondent.

REGISTER, Chief Judge.

This is a suit brought by the petitioner-union under Section 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185, to compel arbitration of four grievances as arising out of a collective bargaining agreement with the respondent-employer.

The petitioner-union is the bargaining representative for the operating and maintenance employees employed by the Manufacturing and Research Department of the respondent at the latter's Mandan, North Dakota, refinery. Collective bargaining contracts have governed the relationship between the petitioner and the respondent at such refinery since August 12, 1955. The contract which was in effect at the times herein involved became effective on October 11, 1958, and under the provisions thereof shall continue in full force and effect until October 11, 1960, and from year to year thereafter, unless the same is terminated, modified or amended as therein provided.

During 1959, the petitioner filed four grievances, each of which charged the respondent with violation of the said agreement. Each of such grievances was basically a complaint against the contracting out of work by the respondent, and petitioner demanded that the respondent arbitrate such grievances. The respondent refused so to do upon the ground that the same were not arbitrable under the said agreement. After such refusal, this action was instituted—the relief sought is that the Court "issue its Order compelling the Respondent to comply with the grievance arbitration provisions of the collective bargaining agreement * * *". Petitioner's contention is that respondent has breached such agreement by contracting out work to in-

dependent contractors and that this is a matter which is subject to arbitration under the agreement. Respondent's contention is that this dispute is not arbitrable under the agreement, but is within the limitations set forth in the last two paragraphs of Section 8 of Article II of such agreement.

The agreement states that "This Agreement is entered into to provide a method of settling differences or grievances amicably which may arise between the Company and its employees. It is the desire of both parties to provide efficient operation of the facilities of the employer". The agreement contains the standard "Recognition" clause.

The pertinent portions of said Article II, Section 8, are as follows:

"Section 8. Subject to the limitations set forth in the last two paragraphs of this Section 8, if any question concerning the interpretation or application of any of the terms or provisions of this Agreement is not settled as a result of negotiations between the Refinery Manager, or those designated by him, and the Union, within a period of fifteen (15) calendar days or within an extension of that time mutually agreed upon, the Union or the Company may refer the question for arbitration * * *.

"It is understood and agreed, however, that proposals to add to or change this Agreement shall not be arbitrable and that no proposal to modify, amend or terminate this Agreement, as well as any matter or subject arising out of or in connection with such proposal, may be referred for arbitration under this Section.

"Questions concerning any liability or obligation of the Company which require the construction or interpretation of any statute or law; for example but not by way of limitation, Fair Labor Standards Act, Workmen's Compensation Laws, Labor Management Relations Act, and Social Security Laws, shall not be eligible for processing under the grievance procedure."

The agreement further provides:

"Article XIII

"Stoppage of Work

"Section 1. The Company agrees that during the term of this Agreement there shall be no lockouts of employees and the Union agrees that there shall be no strikes, slowdowns, or stoppages of work while this Agreement is in effect."

The narrow question before the Court is whether the respondent agreed to arbitrate such grievances. The merits, if any, of the grievances, must not be considered by the Court.

On June 20, 1960, the United States Supreme Court decided three cases involving arbitration under collective bargaining agreements. In each of these cases the petitioner-union instituted the suit to compel arbitration after refusal so to do by the respondent. These three cases are: United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 1345, 1363, 4 L.Ed.2d 1403, 1432; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409; and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424.

In American, the agreement provided for arbitration of all disputes between the parties "as to the meaning, interpretation and application of the provisions of this agreement". This has been referred to as the "standard" form of arbitration clause. The Court stated that:

"The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is then confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is

right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for."

In Enterprise, the agreement provided that " * * * It is understood and agreed that neither party will institute civil suits or legal proceedings against the other for alleged violation of any of the provisions of this labor contract; instead all disputes will be settled in the manner outlined in this Article III—Adjustment of Grievances." A grievance was filed, respondent refused to arbitrate, arbitration was ordered by the District Court (in a suit brought for specific enforcement of the arbitration provisions of the agreement), an award was made by the arbitrator, and respondent refused to comply. The Court held that, in such a case, the courts should refuse to review the merits of an arbitration award, and, in referring to American, stated that:

"As we there emphasized the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."

Warrior is much more similar than are American and Enterprise to the case before this Court. Indeed, in oral argument, counsel for respondent in effect took the position that the principles laid down by the Supreme Court in Warrior, properly applied to the facts here involved, will control and be decisive herein. Counsel for petitioner in effect agreed that the decisions in American, Warrior and Enterprise, together with those which appear in Local 1912, International Ass'n of Machinists v. United States Potash Co., 10 Cir., 270 F.2d 496, certiorari denied 80 S.Ct. 1609 "estab-

lished the guide lines of suits for injunction to arbitrate".

Petitioner contends that both the factual situation and the contract provisions in Warrior and the case before this Court are quite similar and nearly parallel, and require the same decision. With this position, respondent emphatically disagrees.

 A careful analysis of Warrior is essential. Insofar as Warrior is helpful herein, it seems to the Court that the following are the general principles laid down by the Supreme Court and which must be considered:

1. Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to do.

"For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Majority opinion, 363 U.S. at page 582, 80 S.Ct. at page 1353.

2. The courts have the exclusive duty of determining whether the reluctant party has breached the promise to arbitrate—this is not a question to be left to the arbitrator.

"The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate." Majority opinion, 363 U.S. at page 582, 80 S.Ct. at page 1353.

3. The court's inquiry is confined and limited to determining whether the reluctant party did agree to arbitrate the grievance—it is not for the court to consider the merits of the grievance.

" * * * the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or agreed to give the arbitrator power to make the award he made." Majority opinion, 363 U.S. at page 582, 80 S.Ct. at page 1353.

4. Where the exclusion clause is vague and the arbitration clause quite broad, doubt should be resolved in favor of arbitration.

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." Majority opinion, 363 U.S. at pages 584–585, 80 S.Ct. at page 1354.

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Majority opinion, 363 U.S. at pages 582–583, 80 S.Ct. at page 1353.

5. The parties to an arbitration agreement may exclude any disputes or grievances from arbitration. (This is, in effect, a corollary of No. 1.)

"Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement." Majority opinion, 363 U.S. at page 581, 80 S.Ct. at page 1352.

6. The arbitration agreement, being a matter of contract, should be interpreted in accordance with the intention of the parties as therein expressed and in the light of the facts and circumstances surrounding the negotiations for and execution of the agreement.

"A specific collective bargaining agreement may exclude contracting-out from the grievance procedure. Or a written collateral agreement may make clear that contracting-out was not a matter for arbitration. In such a case a grievance based solely on contracting-out would not be arbitrable. Here, however, there is no such provision. Nor is there any showing that the parties designed the phrase 'strictly a function of management' to encompass any and all forms of contracting-out. * * *" Majority opinion, 363 U.S. at page 584, 80 S. Ct. at page 1354.

As to this, the concurring justices stated (363 U.S. at page 570, 80 S.Ct. at page 1364) as follows:

"* * * the arbitration promise is itself a contract. The parties are free to make that promise as broad or as narrow as they wish, for there is no compulsion in law requiring them to include any such promises in their agreement. The meaning of the arbitration promise is not to be found simply by reference to the dictionary definitions of the words the parties use, or by reference to the interpretation of commercial arbitration clauses. Words in a collective bargaining agreement, rightly viewed by the Court to be the charter instrument of a system of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion. The Court therefore avoids the prescription of inflexible rules for the enforcement of arbitration promises. Guidance is given by identifying the various considerations which a court should take into account when construing a particular clause—considerations of the milieu in which the clause is negotiated and of the national labor policy. * * *".

It is obvious that there are two substantial, and this Court believes, vital, differences in the contract here before the Court and that involved in Warrior. The first is in the breadth of the arbitration clause. Both contracts have the "no strike" and "no lockout" provisions.

In Warrior, the agreement provided that "Should differences arise * * * as to the meaning and application of the

provisions of this Agreement, or should any local trouble of any kind arise," the grievance procedure should be followed. In the contract here before the Court, it is expressly agreed that there shall be certain limitations. Section 8 provides that "*Subject to the limitations set forth in the last two paragraphs of this Section 8*, if any question concerning the interpretation or application of any of the terms or provisions of this Agreement is not settled \* \* \*", the question may be referred to arbitration. (Emphasis added).

In Warrior, the exclusion clause is very vague—the agreement excluded "matters which are strictly a function of management". Warrior Company contended that the contracting out there involved was a matter which was strictly a function of management within such exclusion. The Court held in effect that this was a dispute "as to the meaning and application of the provisions of this Agreement" which the parties had agreed would be determined by arbitration. In the majority opinion, the Court specifically stated that "Nor is there any showing that the parties designed the phrase 'strictly a function of management' to encompass any and all forms of contracting out." 363 U.S. at page 584, 80 S.Ct. at page 1354. The concurring justices (363 U.S. at page 571, 80 S.Ct. at page 1364) in this regard stated: "Again the court, without more, must send any dispute to the arbitrator, for the parties have agreed that the construction of the arbitration promise itself is for the arbitrator, and the reluctant party has breached his promise by refusing to submit the dispute to arbitration."

The next to the last paragraph of Section 8 of the contract here involved (being the first paragraph thereof containing the limitations to which grievances are subject to arbitration) provides:

"It is understood and agreed, however, that proposals to add to or change this Agreement shall not be arbitrable and that no proposal to modify, amend or terminate this Agreement, as well as any matter or subject arising out of or in connection with such proposal, may be referred for arbitration under this Section."

According to the concurring opinion in Warrior, these words "are to be understood only by reference to the background which gave rise to their inclusion." This "background" is perhaps the best evidence of the design or intent of the parties.

The evidence conclusively establishes that ever since the commencement of collective bargaining at the Mandan refinery between the parties hereto (beginning in 1955), both the scope of the arbitration clause and the subject of contracting out work have been issues which both parties have considered to be of great importance and have been the subject of discussion and negotiation.

In the first suggested contract submitted by the union to respondent, paragraph 9 of Article X provided: "It is further agreed that any controversy involving the interpretations or alleged violations of this contract is also arbitrable and will be taken up at the request of either party \* \* \*". (Resp. Ex. F, p. 19).

In said first proposed contract (Resp. Ex. F, p. 22), the following appears with reference to contracting out of maintenance work:

"Section 2. Contracting out of Maintenance Work

"(1) No maintenance work will be let out to a contractor when the Company has the necessary equipment and men to do the work. No maintenance work will be performed by men outside of the bargaining unit nor contracted out to the extent of reducing the maintenance force.

"(2) No maintenance work nor new construction work will be contracted out to any firm not employing A.F. of L. craftsmen."

Such proposals were refused and rejected by respondent and, following ne-

gotiations, the contract executed omitted all of the above-quoted proposed provisions, and provided not only for limited arbitration, but contained the specific exclusions here involved (Resp. Ex. H, pp. 7–9).

That contracting out of work, including maintenance work, was a policy of the respondent ever since the beginning of the Mandan refinery, is established by Resp. Ex. G and other evidence of record. Knowledge as to this of petitioner is established by Resp. Ex. D and other evidence.

Said first collective bargaining agreement (Resp. Ex. H) provided (Article XVIII) in effect that the same would continue unless either party thereof should notify the other in writing of its desire to terminate, modify or amend the Agreement, within the time and as provided therein.

Enclosed with letter from the President and Secretary of petitioner, dated February 11, 1957, a new contract was submitted and proposed. In the body of said letter appears the following:

"In keeping with the terms of our present contract we are using this means of notifying you that we are on this date opening the conract (sic) for re-negotiations.

"We are enclosing a new contract in its entirety which in (sic) our proposal for a new one. In the event this one is not satisfactory to you and the Standard Oil Company we are ready to start negotiations at the time an (sic) place mutually agreed upon." (Resp. Ex. E).

Such proposed new contract (Resp. Ex. E), with reference to restricting contracting out work, contained the following:

"Article XVIII

"Miscellaneous

"*Section 10.* The Company will not contract any new Construction or plant Maintenance to any Contractor who does not employ A.F.L. Labor.

"*Section 11.* The Company will not contract out any work, when the contract will force the reduction of man power in the Mandan Refinery."

Under said Resp. Ex. E, a grievance would have been defined as follows:

"Under this Agreement a grievance is defined as any difference of opinion between the two parties regarding alleged violation of the Agreement including rates of pay, hours of employment and all other conditions of employment not expressible provided for in this Agreement, including discharge, discipline and written reprimand, when an employee receives such from his Supervision. This is intended also to include violation of any written side Agreement or arbitration award, and also the modification by the Company of any policy, practice, custom or usage; the establishment by the Company of new policies pertaining to the working conditions at the Mandan Refinery, customs or usages during the terms of the Agreement."

These above-quoted proposals were resisted by respondent and, following negotiations, were omitted from the following executed new contract (Resp. Ex. I), which contained the provisions of the former contract hereinbefore quoted, and which are the provisions here involved.

Resp. Ex. I (the 1957 Agreement), also provided as to its effective date and that it would remain in full force and effect thereafter unless, within a certain time and in a specified manner, "either party notifies the other in writing of its desire to terminate, modify or amend the Agreement". (Article XVIII, Sec. 1, p. 31.)

Under date of April 2, 1958, petitioner, by its President and Secretary, wrote a letter (a part of Resp. Ex. A) to respondent, the first paragraph of which is as follows:

"In accordance with Article XVIII, Section 1 of working Agreement, covering the Operating and

Maintenance Employees and in accordance with Article XIV, Section 1 of working Agreement, covering the Office Clerical Employees of the Accounting Division, Local 725, International Union of Operating Engineers wishes to notify the Standard Oil Company, Mandan Refinery of the Locals desire to modify or amend the Agreements."

In such proposed new contract, petitioner proposed to enlarge the scope of the arbitration clause (and, in effect, eliminate the then existing contractual limitations thereof) as follows:

"Article II

"Grievance Procedure

"Section 9. The following grievances may be processed thru the grievance procedure including arbitration.

"1. Grievances involving discharge, suspension, disciplinary action resulting in loss of pay such as demotion.

"2. Grievances involving applications or interpretations of an alleged noncompliance with past policies, practices, customs or usages relative to working conditions and grievances arising from

"A. The modification by the Company of any said policies, practices, customs and usages.

"B. The discontinuance by the Company of any said policies, practices, customs and usages.

"C. The establishment by the Company of new policies, practices, customs or usages during the term of this agreement."

Such proposals were rejected by respondent. As a result of the failure of the parties to negotiate successfully as to these and other proposals of petitioner, a strike resulted—a strike which continued for approximately one month and which was expensive to both the members of the union and to respondent.

During such negotiations, both parties considered the proposals quoted above (that is, enlarging the scope of the arbitration clause and in effect eliminating the limitations contained in the then existing contract) to be of substantial importance. In "An Open Letter to the Citizens of North Dakota" by the respondent (Resp. Ex. C), published in the "Mandan Daily Pioneer" and other newspapers, respondent discussed the proposal "Enlarging the Scope of Arbitration", and therein, in part, said: "The Union proposed the scope of arbitration be greatly expanded to provide, in effect, for arbitration if the Union objected to any policy decision by management affecting working conditions". In one issue of "Local 725 News Letter", prepared and sent to its members by petitioner during the strike period, appears the following: (Resp. Ex. B)

"Brushed aside, made light of, or completely forgotten in-so-far as the Company is concerned, is our suggestion for an improved grievance procedure, including more things which may be brought to arbitration * * *" and

"They have refused to add a paragraph which would prohibit the contracting out of work that would result in a reduction of the present work force."

The evidence which has been referred to by the Court establishes that, from the beginning of collective bargaining agreement negotiations between the parties in 1955, and to the time of the execution of the present agreement (Pet. Ex. 1), the parties believed, understood and agreed:

1. that contracting out of maintenance work was a policy of the respondent;

2. that the written contract permitted the Company to exercise and continue such policy; and

3. that the same was not arbitrable but was specifically excluded from the scope of arbitration.

The proposals by petitioner to have clauses incorporated in the new contracts which would enlarge the scope of such

arbitration, and would in effect include the policy of contracting out to such procedure, were understood to be and were submitted and proposed by petitioner as "amendments" or "modifications" of the then existing written agreement, and were referred to by the petitioner as such. Respondent was adamant in its rejection thereof, and in its refusal to have the contract so "modified" or "amended", and the same were, following negotiations between the parties, in effect waived or dropped by petitioner and omitted from the contract thereafter executed and which is here involved.

Had the proposals by petitioner been accepted by respondent and incorporated into the agreement, the agreement would have been, accordingly, "modified" or "amended"—and it was so understood by the respective parties. The proposals were submitted by petitioner on the theory and basis that they did constitute such "modifications" or "amendments". As such, they were explicitly and expressly excluded from arbitration by the written agreement.

It is therefore the opinion of the Court that respondent did not agree to submit the matter of contracting out (which is the basis for the grievances here involved) to arbitration, and that it was the intention of the parties (as revealed and established by the facts and circumstances surrounding the negotiations for and execution of the agreement—the "background" for such agreement) that the same be excluded from the arbitration clause, and that such intention was and is specifically expressed in and by the first paragraph containing such limitations, and that the words therein used were intended and designed by the parties to encompass the contracting out which is the basis for said grievances. The evidence as to this is not only forceful—it is overwhelming. While the arbitration clause is quite broad, it is expressly limited; the exclusion clause is plain, explicit and specific.

Counsel for petitioner strenuously asserts that, after the execution of the existing contract (Pet. Ex. 1), respondent changed or modified its policy of contracting out maintenance work. Respondent contends that such policy was not one of change but of degree only. The Court considers this as being immaterial. Petitioner claims that the kind of work done by employees of outside contractors after the execution of Pet. Ex. 1 has caused a greater effect upon the work of its members than theretofore. However, the very basis throughout all of the time since commencement of negotiations in 1955 of objection on the part of petitioner to contracting out, is that it affects the work of its members. This is shown by Resp. Ex. F, p. 22, and Resp. Ex. A. The petitioner's proposal in 1958 (Resp. Ex. A), in part, was: "Section 9. The Company will not contract out any work, *when the contract will force the reduction of man power in the Mandan Refinery.*" (Emphasis added). In the same proposed contract, petitioner proposed to enlarge or expand the grievance procedure by including not only "interpretations or an alleged non-compliance with past policies, practices, customs or usages * * *", but also "The modification by the Company of any of said policies, practices, customs and usages". All of such proposals to "modify" or "amend" the existing contract were resisted by respondent and none were incorporated therein. The contract contained the exact clauses, in this regard, as the former ones, and it is obvious that when the parties executed it, in effect they agreed not to include as arbitrable not only the then existing and past "policies, practices, customs or usages", but also "the modification by the Company" of any thereof.

A dispute as to whether said grievances are within the arbitration clause is a "matter or subject arising out of or in connection with such proposal" and therefore not arbitrable by the express and specific provisions thereof.

In view of the foregoing, it is unnecessary for the Court to express an opinion as to whether the basis for said grievances is within the limitations contained in the last paragraph of said Section 8.

904

The respondent is entitled to Judgment of Dismissal.

As permitted by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. this Memorandum will constitute the Findings of Fact and Conclusions of Law herein.

Counsel for respondent will prepare and submit appropriate form of Judgment in conformity herewith.