**S.A. MINERACAO DA TRINDADE–SAMITRI, Plaintiff,**

v.

**UTAH INTERNATIONAL INC., Utah-Marcona Corporation, Mineracao Marex Ltda., Marcona International S.A., Marcona Inc., and Samarco Mineracao S.A., Defendants.**

No. 83 Civ. 2176 (GLG).

United States District Court,
S.D. New York.

Dec. 27, 1983.

As Amended Jan. 11, 1984.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City (Wayne A. Cross, William I. Sussman, William Dunnegan, New York City, of counsel), for plaintiff.

Reid & Priest, New York City and Pillsbury, Madison & Sutro (Gerald Aksen, John M. Nonna, New York City, Allan N. Littman, Charles R. Ragan, Bruce A. Ericson, John M. Grenfell, San Francisco, Cal., of counsel), for defendants.

## OPINION

GOETTEL, District Judge.

Plaintiff S.A. Mineracao da Trindade-Samitri ("Samitri"), a Brazilian corporation, brought this action to obtain, *inter alia,* a declaratory judgment and damages against six defendants, corporations in Brazil, Panama and the United States (the "Defendants"),[1] charging that the Defendants fraudulently induced Samitri to enter into a $600,000,000[2] international iron ore mining venture, and alleging seventeen assorted claims under the laws of Brazil and the United States.[3] The Defendants have

---

1. The Defendants include: (1) Utah International Inc., a Delaware corporation with its principal place of business in San Francisco, California; (2) Utah Marcona, a New York corporation with its principal place of business in San Francisco, California; (3) Mineracao Marex Ltda., a limited liability Brazilian company; (4) Marcona International S.A., a Panamanian corporation with its principal place of business in San Francisco, California; (5) Marcona Inc., a Delaware corporation with its principal place of business in San Francisco, California; (6) Samarco Mineracao S.A., a Brazilian corporation with its principal place of business in Belo Horizonte, Brazil. Samarco has retained independent counsel, but has not as yet made a general appearance nor responded to the complaint. The six defendants are referred to collectively in order to avoid confusion and because none of the issues presented at this stage of the proceedings requires the Court to consider any of the Defendants individually.

2. The $600,000,000 figure is an estimate of the total investment in the assets of the mining venture. The current replacement value of the assets is approximately $1,000,000,000. *See* Memorandum in Support of Motion to Stay Proceedings Pending Arbitration and to Compel Arbitration at 2.

3. Claims 1 through 3 are brought under the United States Securities Act of 1933, 15 U.S.C. §§ 77a–aa (1982), and the United States Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–kk (1982). Claims 4 through 9, as well as 13, appear to be brought under various theories of common law. Claims 10, 11 and 12 are brought

moved, pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1–14, 201–08 (1982), to stay the prosecution of Samitri's complaint in this Court[4] and to compel arbitration.[5] In response, Samitri has cross-moved, pursuant to Fed.R.Civ.P. 65(a), to enjoin arbitration. For the reasons set forth below, the Court orders arbitration of all of Samitri's claims except the two brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982) ("RICO"), the litigation of which is temporarily stayed pending arbitration.

## BACKGROUND

The chain of events culminating in this action began in the early 1970's when Samitri and the Defendants commenced discussions concerning the possibility of engaging in a joint venture to mine iron ore from certain undeveloped iron ore reserves owned by Samitri in Brazil. At the time, Samitri was supplying substantial amounts of iron ore products to European and South American purchasers but very little of those products to purchasers in the United States. Samitri's hope and, it contends, the Defendants' promise, was that if the parties entered into the venture then the Defendants would be able to procure long-term contracts for the sale of iron ore products to customers in the United States. In 1973 the parties agreed to undertake the venture and for that purpose formed a new

jointly-owned corporation, Samarco Mineracao S.A. ("Samarco").

On December 10, 1974, Samitri and the Defendants entered into three major contracts in order to structure and finance the project. These three contracts, hereinafter collectively referred to as the "1974 Agreements," include: (1) the "Samarco Project Agreement," which set forth the general business plan for the venture and the basic terms upon which the parties would proceed; (2) the "Samarco Shareholders' Agreement," which established the essential rules for Samarco's governance and the relations among its shareholders and provided that Samitri and the Defendants would purchase, respectively, 51% and 49% of the equity securities in Samarco; and (3) the "Contract of Commercial Representation," which specified the sales and marketing duties of the parties. In general terms, the 1974 Agreements called for Samitri to provide Samarco with access to Samitri's iron ore deposits in Brazil, for Samarco to mine and process the iron ore, and for the Defendants to act as Samarco's principal marketing agent throughout the world and as its exclusive marketing agent in the United States.

Although the 1974 Agreements set forth in great detail Samitri's and the Defendants' rights and obligations with respect to the Samarco project, the parties continually amended those agreements and entered into a number of supplemental contracts,

---

under the laws of Brazil. Claims 14 and 15 appear to be brought under the United States Declaratory Judgments Act, 28 U.S.C. § 2201 (Supp. V 1981). Claims 16 and 17 are brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982).

**4.** 9 U.S.C. § 3 (1982) provides:

*Stay of proceedings where issue therein referable to arbitration.*

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action

until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

**5.** 9 U.S.C. § 2 (1982) provides:

*Validity, irrevocability, and enforcement of agreements to arbitrate.*

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

during the latter part of the 1970's and early 1980's. Pursuant to the original Shareholders' Agreement, the parties executed a number of so-called stock purchase agreements under which Samitri and the Defendants together purchased a total of approximately $400,000,000 of securities in Samarco (the "Stock Purchase Agreements"). On August 16, 1979, the parties executed an agreement whereby Samitri and the Defendants agreed to guaranty Samarco's debts and liabilities (the "1979 Guaranty Agreement"). And on July 23, 1982, the parties consented to an additional agreement under which Samitri and the Defendants were required to purchase even more securities in Samarco (the "1982 Memorandum of Agreement"). These agreements entered into after 1974 are collectively referred to by the parties as the "Post-1974 Agreements."

On December 23, 1982, after learning of the cancellation of certain of Samarco's major contracts to supply iron ore products to United States purchasers, Samitri sought to withdraw its interest in Samarco and to rescind each of the contracts between itself and the Defendants. Subsequently, on March 22, 1983, Samitri brought this action to obtain, *inter alia,* a declaratory judgment that it had lawfully rescinded the 1974 and Post-1974 Agreements and a restoration of the *status quo ante,* including restitution of approximately $200,000,000 which it had paid for securities in Samarco.

Samitri's argument essentially is that the Defendants fraudulently induced it to enter into the Samarco project by representing that the Defendants had obtained long-term agreements with three United States purchasers for the sale of more than one-third of the iron ore products expected to be produced by Samarco when in fact the Defendants had not obtained such agreements. Samitri claims that these alleged sales agreements were central to its deci-sion to invest in the project, and that without them, Samarco would never have been formed. Samitri also alleges a number of claims for breach of contract and for breach of fiduciary duties.

On May 31, 1983, the Defendants filed a motion to compel arbitration of all of Samitri's claims on the grounds that such arbitration was required under the terms of each of the 1974 Agreements. Samitri, however, contends that its claims can properly be resolved only in court, arguing: (1) that the scope of the, arbitration clause provided in the 1974 Agreements does not include claims of fraud in the inducement; (2) that claims of fraud in the inducement of the Post-1974 Agreements are not arbitrable because none of those agreements contains an arbitration clause; (3) that Samitri's claims under RICO are within the exclusive jurisdiction of the courts and are therefore not arbitrable; and (4) that Samitri's claims under the Securities Act of 1933, 15 U.S.C. §§ 77a–aa (1982), and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–kk (1982), are federal statutory claims which are not arbitrable. The Court now considers each of Samitri's arguments.

DISCUSSION

1. *The 1974 Agreements*

 Before considering the nature of any obligation to arbitrate under the 1974 Agreements, the Court notes that with respect to a contract involving a transaction in foreign or interstate "commerce," as defined in the United States Arbitration Act, 9 U.S.C. §§ 1–14, 201–08 (1982),[6] the interpretation, validity and enforcement of an arbitration clause within such a contract are governed by federal law. *Prima Paint Corp. v. Flood & Conklin Mfg.,* 388 U.S. 395, 403–05, 87 S.Ct. 1801, 1805–1806, 18 L.Ed.2d 1270 (1967); *Bell Canada v. ITT Telecommunications Corp.,* 563 F.Supp. 636, 638 (S.D.N.Y.1983). An arbitration clause must be interpreted in ac-

---

**6.** 9 U.S.C. § 1 (1982), in pertinent part, provides: "[C]ommerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or be-tween any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation ....

cordance with the intention of the parties, *Local No. 725, International Union of Operating Engineers v. Standard Oil Company of Indiana,* 186 F.Supp. 895, 899 (D.N.D.1960), and by ascertaining and examining the context in which it was made. *Bricklayers, Masons, Marble and Tile Setters, Protective and Benevolent Union No. 7 of Nebraska v. Lueder Construction Co.,* 346 F.Supp. 558, 562 (D.Neb.1972). As a general rule, "a party cannot be required to submit to arbitration any disputes which he has not agreed to submit." *Coudert v. Paine Webber Jackson & Curtis,* 705 F.2d 78, 81 (2d Cir.1983), *citing United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960). However, arbitration clauses must be interpreted broadly and all doubts as to whether a dispute is encompassed by a particular clause must be resolved in favor of arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* — U.S. ——, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1212 (2d Cir.1972). Importantly, arbitration clauses are separable from the contracts in which they are contained, so that a general claim of fraud in the inducement of a contract—as distinguished from a claim of fraud directed at the arbitration clause itself—does not operate to nullify the agreement to arbitrate. *Prima Paint Corp., supra,* 388 U.S. at 403–04, 87 S.Ct. at 1805–1806.

▮ In the case at hand, each of the 1974 Agreements between Samitri and the Defendants contains a broad arbitration clause providing, in pertinent part:

Whenever any question or dispute shall *arise or occur under* this [Agreement/Contract], such question or dispute shall (if it is not amicably settled by the Parties) be finally settled by arbitration in Paris, France, by one or more arbitrators appointed in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce . . . .

*See* Affidavit of Kenneth E. Merklin: Exhibit A, Samarco Project Agreement ¶ 10; Exhibit B, Shareholders' Agreement ¶ 11; Exhibit C, Contract of Commercial Representation ¶ 8 (emphasis added).

Samitri argues that its claims of fraud in the inducement are not based upon matters *within* the 1974 Agreements, but rather on matters *outside* those agreements. Therefore, relying on *In re Kinoshita & Co.,* 287 F.2d 951 (2d Cir.1961), and *Michele Amoruso E Figli v. Fisheries Development Corp.,* 499 F.Supp. 1074 (S.D.N.Y.1980), Samitri contends that because its claims do not "arise or occur under" the agreements, even though they may "relate" to the agreements, the claims are not arbitrable.[7] The Court disagrees. Although Samitri's argument has some appeal in semantics, it does not provide a dispositive answer to the question of the proper scope of the arbitration clause.

Only months ago, Justice Brennan for the Supreme Court reiterated the well developed judicial principle that, "as a matter of federal law, *any doubts* concerning the scope of arbitrable issues should be resolved in favor of arbitration whether the problem at hand is the *construction of the contract language itself* or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, supra,* 103 S.Ct. at 941 (emphasis added) (citing *Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638, 643 (7th Cir.1981); *Wick v. Atlantic Marine, Inc.,* 605 F.2d 166, 168 (5th Cir.1979); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH,* 585 F.2d 39, 43–45 (3d Cir.1978); *Hanes Corp. v. Millard,* 531 F.2d 585, 598 (D.C.Cir.1976); *Acevedo Maldonado v. PPG Industries, Inc.,* 514 F.2d 614, 616–17 (1st Cir.1975); *Germany v. River Termi-*

---

**7.** In *Kinoshita* and *Amoruso,* the courts held that the inclusion in an arbitration agreement of the phrase "relating to," or words of like import, required the issue of fraud in the inducement of the basic agreement to be resolved by the arbitrators and not the courts, but held that an arbitration provision restricted to disputes "arising out of" the contract did not encompass a dispute over its fraudulent inducement and hence was to be resolved by the courts.

*nal R. Co.,* 477 F.2d 546, 547 (6th Cir.1973); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1212 (2d Cir.1972); *Hart v. Orion Insurance Co.,* 453 F.2d 1358, 1360–61 (10th Cir.1971)). As discussed below, the proper scope of the arbitration clause in the instant case is in doubt and, as a consequence, the Court is led to the conclusion that the issue of whether Samitri's claims of fraud in the inducement are arbitrable must be resolved in favor of arbitration. This conclusion, moreover, is required under *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), where the Supreme Court held that claims of fraud in the inducement of an agreement were arbitrable under an arbitration clause similar to the one found here.

That there are doubts as to the proper scope of the arbitration clause in the 1974 Agreements becomes clearer by comparing the seventeen claims Samitri alleges in its complaint. Samitri alleges two claims under both common law and the Brazilian Civil Code for breach of various contracts, *see* Complaint ¶¶ 109–12, and two claims for breach of fiduciary duties which derive from those contracts, *see* Complaint ¶¶ 97–8, 103–04. In addition, Samitri relies upon the same factual allegations to establish these claims as it does to establish its several claims of fraud in the inducement. *See* Complaint ¶¶ 109, 111. Consequently, all of Samitri's claims involve the contractual relations among the parties to the 1974 Agreements as well as the Defendants' performance under those agreements, and each claim requires an interpretation of those agreements. *See Hannah Furniture Co. v. Workbench, Inc.,* 561 F.Supp. 1243, 1245 (W.D.Pa.1983). Thus, when considering Samitri's claims of fraud in the inducement relative to its other claims, it becomes difficult to make a meaningful distinction between those claims which "arise or occur under" the contract and those which "relate" to the contract. As is common in cases similar to this one, the issue of fraud in the inducement is inextricably tied in with the other issues presented. *See e.g., Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 271 F.2d 402,

410 (2d Cir.1959). And, as Judge Medina has aptly noted, it appears that "the difference between fraud in the inducement and mere failure of performance [under a contract] depends upon little more than legal verbiage and the formulation of legal conclusions ...." *Id.*

There is no need, however, to belabor the linguistic niceties of the terms of the arbitration clause—an endeavor which based upon the briefs submitted by the parties, would in any case prove futile. The fact that numerous courts have reached conflicting interpretations when construing language similar or identical to the language at issue in this case leads the Court, *ipso facto,* to the conclusion that the scope of the clause is in doubt. All doubts, of course, must be resolved in favor of arbitration. *See Moses H. Cone Memorial Hospital, supra,* 103 S.Ct. at 941.

While it is true, as noted above, that two cases cited by Samitri, *Michele Amoruso E Figli, supra,* 499 F.Supp. 1074, and *In re Kinoshita & Co., supra,* 287 F.2d 951, hold that disputes involving fraud in the inducement do not "arise out of or under" the principal contract, other cases hold to the contrary. In *Anna's Queen, Inc. v. Dining Room Employees,* 85 L.R.R.M. (BNA) 2375 (S.D.N.Y.1974), where the arbitration clause before the court provided for the arbitration of "[a]ny dispute arising under the interpretation or application of any of the provisions of this agreement ...," Judge Carter held that "[c]laims of fraud in the inducement of the principal contract are for the arbitrator to decide *where, as here, the arbitration clause is broad enough to encompass such claims.*" (Emphasis added.) Although Judge Carter requested the parties to submit additional briefs before rendering a final decision on the issues before him, his opinion unequivocally assumes that claims of fraud in the inducement can be said to "arise out of" a contract.

Similarly, in *Weinrott v. Carp,* 32 N.Y.2d 190, 344 N.Y.S.2d 848, 298 N.E.2d 42 (1973), *reaffirmed in Information Sciences v. Mohawk Data Science,* 43 N.Y.2d

918, 403 N.Y.S.2d 730, 374 N.E.2d 624 (1978), where an arbitration clause no broader than the clause at issue in the instant case called for arbitration of "[a]ll disputes, controversies or claims arising hereunder, [and] the interpretation of any of the provisions or the performance called for thereunder ...," Judge Wachtler of the Court of Appeals of New York held that such language is broad enough to include claims of fraud in the inducement. Judge Wachtler noted that "[the] provision is clearly a 'broad' provision, and whether or not it will be given effect depends more on policy than on the wording of the provision itself." *Id.* at 853, 298 N.E.2d at 45. He continued:

> [A] demand for specificity as to which particular issues should be submitted to the arbitrators would make the drafting of arbitration agreements burdensome, confusing and often impossible .... The alternative to making parties specifically name fraud in the inducement as an issue they wish to go to arbitration would be to give full effect to a broad arbitration clause. A broad arbitration agreement reflects a general desire by the parties to have all issues decided speedily and finally by the arbitrators. If, in the case at bar, we hold that the arbitration agreement did not contemplate the submission of fraud in the inducement to the arbitrators we would be opting for the 'specifically .enumerated' approach ....

*Id.* at 854, 298 N.E.2d at 46.

In yet another case, *Scherk v. Alberto-Culver Co., supra,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, where the contract clause in question called for the arbitration of "any controversy or claim [that] shall arise out of this agreement or the breach thereof," Justice Stewart for the Supreme Court held that claims of fraud in the inducement of the contract were arbitrable. Samitri argues that *Scherk* is not controlling since, unlike in the instant case, the alleged misrepresentations relied upon by the plaintiff in *Scherk* had been expressly incorporated into the terms of the principal agreement, and therefore, "any claim regarding those misrepresentations would

necessarily 'arise out of [the] agreement or the breach thereof.'" Reply Memorandum in Support of Plaintiff's Cross-Motion to Enjoin Arbitration at 7–8. But this attempt to distinguish *Scherk* is simply inapposite. Assuming, *arguendo,* that a claim of fraud in the inducement of a contract arises *outside* of the contract, the incorporation of the misrepresentation expressly into the contract would at most give rise to an additional claim, one for breach of contract. The incorporation would not, however, render the otherwise nonarbitrable claim of fraud in the inducement arbitrable, for that claim would still have arisen outside of the contract. Thus, this Court must assume that in *Scherk* the incorporation of the misrepresentations into the contract had little influence upon the Supreme Court's decision and that the holding there also applies in the instant case.

In *Scherk,* Justice Stewart noted that in "truly international" business agreements:

> [a] contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is ... an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved .... A parochial refusal by the courts of one·country to enforce an international arbitration agreement would ... frustrate these purposes ....

*Id.* 417 U.S. at 516, 94 S.Ct. at 2455–2456.

As in *Scherk,* the instant case involves a "truly international" business transaction. The parties are from Brazil, Panama and the United States. The 1974 Agreements underlying the Samarco project call for arbitration of disputes in Paris, France, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce. Additionally, the agreements are governed by the laws of Brazil,

with respect to matters including validity, construction, performance and enforcement. As a consequence, under the clear ruling of *Scherk*, this Court must honor the arbitration agreement entered into between Samitri and the Defendants.

For all of the foregoing reasons, the Court orders arbitration of Samitri's claims of fraud in the inducement with respect to the 1974 Agreements.

### 2. The Post-1974 Agreements

■ Samitri argues that even if the arbitration clauses contained in the 1974 Agreements were intended to encompass claims of fraud in the inducement of those particular agreements, those clauses do not encompass Samitri's claims of fraud in the inducement with respect to the three Post-1974 Agreements, which contain no arbitration clauses. In response, the Defendants contend that the Post-1974 Agreements merely "restate and supplement obligations created by the principal, arbitrable contracts, and Samitri's claims to rescind the [Post-1974 Agreements] are therefore arbitrable ...." Memorandum in Reply on Motion to Stay and to Compel Arbitration and in Opposition to Plaintiff's Cross-Motion to Enjoin Arbitration at 19.

In presenting their argument the Defendants rely upon *Consumer Concepts, Inc. v. Mego Corp.*, 458 F.Supp. 543 (S.D.N.Y.1978). In that case Judge Weinfeld held that an arbitration clause contained in a general license agreement between the plaintiff and the defendant applied to an alleged breach of another contract entered into between the parties subsequent to the date of the license agreement. Although the subsequent contract contained no arbitration clause, Judge Weinfeld noted that the two contracts were "interrelated" and should properly be "read together" in order to make sense of the parties' rights and obligations. *Id.* at 545. Moreover, it appeared that the initial contract which contained the arbitration clause governed the "continuing relationship" between the parties and that the more recent contract was

a "mere extension" of the initial contract. *Id.*

Samitri argues that *Consumer Concepts* is not applicable to the instant case and brings the Court's attention to a decision by the Court of Appeals for the Eleventh Circuit, *Seaboard Coast Line Railroad Co. v. Trailer Train Co.*, 690 F.2d 1343 (11th Cir.1982). There, the court denied arbitration under a contract by which a company made up of several member railroads agreed to provide flat cars to the railroads. The court held that the contract was of limited application, governing only the day-to-day supply of flat cars in return for a per diem rate and not certain subsequent agreements under which the railroads leased other cars from the company. Thus, the arbitration clause in the initial contract did not apply to a dispute arising out of the subsequent leasing agreements. The court distinguished *Consumer Concepts* because there was no evidence suggesting that the initial contract was a "general" or "umbrella" agreement or that the initial contract had any significant relationship with the subsequent lease agreements.

Considering the instant case against the background of *Consumer Concepts* and *Seaboard*, the Court concludes that Samitri's claims of fraud in the inducement of the Post-1974 Agreements are arbitrable. The 1974 Samarco Project Agreement contains a broad arbitration clause and is similar to the *general* contract in *Consumer Concepts*. It explicitly provides that "[t]he Parties shall proceed, and shall cause Samarco to proceed, with the Project upon the terms, and subject to the conditions, hereinafter set forth." Affidavit of Kenneth E. Merklin, Exhibit A, ¶ 1. Thus, to the extent that Samitri and the Defendants entered into the Post-1974 Agreements for the purpose of carrying out the Samarco project plans set forth in the 1974 Agreements, it can be said that disputes concerning the Post-1974 Agreements are subsumed within the broader category of disputes which could arise out of the 1974 Agreements. Hence, the Court is in agreement with the Defendants that the Post-1974 Agreements "restate and supplement

obligations created by the principal, arbitrable contracts ....'" *See* Memorandum in Reply on Motion to Stay and to Compel Arbitration, and in Opposition to Plaintiff's Cross-Motion to Enjoin Arbitration at 19.

With particular respect to the so-called Stock Purchase Agreements, these agreements are not really written contracts at all. Indeed, the term "Stock Purchase Agreements" refers to capital contributions to Samarco made pursuant to the terms of the Shareholders' Agreement. *Id.* The Shareholders' Agreement established a procedure whereby Samarco could obtain extra capital from Samitri and the Defendants in order to meet its obligations to its lenders and to complete the Samarco project. *See* Affidavit of Kenneth E. Merklin, Exhibit B, §§ 2(a), 2(b), 2(c). Thus, disputes concerning the Stock Purchase Agreements are clearly arbitrable under the arbitration clause contained in the Shareholders' Agreement.

Similarly, the 1982 Memorandum of Agreement merely supplements the 1974 Agreements and further defines the parties' obligations in connection with the capitalization, organizational structure and future operation of the Samarco project. For example, it requires Samitri and the Defendants to purchase additional shares of Samarco's stock "upon call by Samarco *in accordance with Paragraph 2 of the Shareholders' Agreement* dated as of December 10, 1974 ...." Affidavit of Steven K. Brimhall, Exhibit C, § 3 (emphasis added). Thus, the 1982 Memorandum of Agreement cannot sensibly be applied or interpreted without specific reference to the Shareholders' Agreement. Consequently, disputes concerning the 1982 Memorandum of Agreement are arbitrable.

Lastly, the 1979 Guaranty Agreement essentially requires Samitri and the Defendants to guaranty, respectively, 51% and 49% of Samarco's liabilities, obligations and indebtedness. Significantly, the 1974 Agreements, which contain arbitration clauses, indicate that the parties specifically contemplated such guaranteed financing arrangements. The Samarco Project

Agreement required the parties to execute a guaranty, *see* Affidavit of Kenneth E. Merklin, Exhibit A, § 1; Exhibit D, § 7.01(c), and amendments to the Shareholders' Agreement plainly show that the parties executed the Shareholders' Agreement with the intention of supplementing it with the guaranty. Thus, as in *Consumer Concepts, supra,* 458 F.Supp. 543, the 1979 Guaranty Agreement, like the 1982 Memorandum of Agreement and the Stock Purchase Agreements, "cannot be read apart from the other [arbitrable] contracts and must be viewed as a supplement" to those contracts. Therefore, disputes concerning the 1979 Guaranty Agreement are arbitrable.

### 3. *RICO Claims*

Samitri argues that its claims asserted under RICO are not arbitrable because such claims fall within the exclusive jurisdiction of the courts. This particular question of whether RICO claims are arbitrable appears to be one of first impression and requires the Court to reconcile conflicting federal policies. On the one hand is the policy which favors arbitration over litigation, especially where the dispute presented involves a transaction in international commerce. *See Scherk, supra,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270. On the other hand, however, is the important public interest in the enforcement of RICO, which may make arbitration an inappropriate method for resolving RICO claims. Because the Court determines that the public interest in the enforcement of RICO is at least as great as the policy in favor of arbitration, the Court finds Samitri's claims under RICO nonarbitrable and stays the litigation of those claims pending arbitration of Samitri's other, arbitrable claims.

■ As a general rule, the question of whether a particular dispute is arbitrable involves only issues of contractual interpretation, requiring the court to determine the scope of the arbitration clause to which the parties have agreed. In certain cases, however, where the resolution of a dispute will have an impact not only on the parties to

the case but also on matters of strong public concern, courts have held that an otherwise arbitrable dispute is not arbitrable. Thus, in the field of antitrust litigation, the Second Circuit has held that "the pervasive public interest in enforcement of the antitrust laws" makes claims under those laws inappropriate for arbitration. *American Safety Equipment v. J.P. Maguire*, 391 F.2d 821 (2d Cir.1968). The Second Circuit noted that:

> [A] claim under the antitrust laws is not merely a private matter. [Antitrust laws are] designed to promote the national interest in a competitive economy; thus the plaintiff asserting his rights under [those laws] has been likened to a private attorney-general who protects the public's interest .... We do not believe that Congress intended such claims to be resolved elsewhere than in the courts.

*Id.* at 826–27.

The holding and rationale in *American Safety* have been widely accepted. *See, e.g., Cobb v. Lewis*, 488 F.2d 41, 47 (5th Cir.1974); *Helfenbein v. International Industries, Inc.*, 438 F.2d 1068, 1070 (8th Cir.1971), *cert. denied*, 404 U.S. 872, 92 S.Ct. 63, 30 L.Ed.2d 115 (1971). "It is now cardinal doctrine that the public interest in the enforcement of the antitrust laws makes antitrust claims inappropriate subjects for arbitration." *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10, 25 (S.D.N.Y.1976).

Turning to the issues of the instant case, the Court concludes that the general public interest in the enforcement of RICO is at least as great as the public interest in the enforcement of antitrust laws. RICO's specific provisions proscribe a wide range of criminal activity. Under section 1962 of RICO it is unlawful to "invest funds derived from a pattern of racketeering activity" in an enterprise engaged in interstate commerce, and to operate or acquire an interest in any such enterprise through "a pattern of racketeering activity." "Racketeering activity" includes designated state law felonies and violations both of certain federal criminal statutes, including the mail and wire fraud laws, and of the antifraud

provisions of the federal securities laws. *See* Note, *Civil RICO: The Temptation and Impropriety of Judicial Restrictions*, 95 Harv.L.Rev. 1101, 1102 (1982).

In enacting RICO, which makes up a significant portion of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922 (1970), Congress declared:

> It is the purpose of [these laws] to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

*See* Pub.L. No. 91–452, 84 Stat. 922 (1970); *see also United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 2531–2532, 69 L.Ed.2d 246 (1981). In *United States v. Ivic*, 700 F.2d 51, 62 (2d Cir.1983), Judge Friendly noted that, in enacting RICO, "Congressional concern centered on the problem of 'black money,' the purchase and operation of legitimate businesses with the proceeds of illegal endeavors." Although RICO ultimately "went somewhat beyond this initial conception, *preventing and reversing the infiltration of legitimate business by organized crime elements remained its core purpose.*" *Id.* at 63.

Given the purposes of RICO, it is abundantly clear that its enforcement involves concerns touching upon vital national interests. Although RICO claims may be brought by private individuals, the resolution of such claims will frequently have an impact on society at large. The Court must infer that Congress did not intend to entrust the enforcement of such laws to arbitrators, and consequently, the Court holds that claims asserted under RICO are not arbitrable.

In arriving at the conclusion that RICO claims are not arbitrable, the Court is mindful of the Supreme Court's decision in *Scherk, supra*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, holding that ordinary claims of fraud asserted under section 10(b) of the Securities Exchange Act of 1934 and

Rule 10b–5 promulgated thereunder are arbitrable when the claims arise out of an international commercial transaction. The Defendants urge the Court to extend *Scherk* to the instant case, arguing that the federal policy in favor of arbitration of disputes arising out of international commercial transactions requires the application of *Scherk* to RICO claims arising from such transactions. However, the public interest considerations involved in the enforcement of RICO are even more significant than the public interest considerations involved in the enforcement of ordinary securities fraud claims such as those involved in *Scherk*. As a consequence, the Court concludes that the holding in *Scherk* should not be extended to apply to RICO claims even when they arise out of an international commercial transaction.

■■■ In staying the litigation of Samitri's RICO claims, the Court notes that such a stay of nonarbitrable claims is normally granted "as a matter of course," *China Union Lines v. American Marine Underwriters*, 458 F.Supp. 132, 135 (S.D.N.Y.1978), especially when the arbitrable claims "permeate" the case and the nonarbitrable claims are weak or peripheral, *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 532 F.2d 874, 876 (2d Cir.1976). Additionally, in actions involving both nonarbitrable antitrust claims and arbitrable common law or statutory claims, courts have ordinarily stayed the litigation of the antitrust claims where the validity of those claims was "uncertain." *See A. & E. Plastik Pak Co. v. Monsanto Co.*, 396 F.2d 710, 716 (9th Cir.1968) (trial court's decision to await results of arbitration before proceeding to determine whether contract violated antitrust laws was not an abuse of discretion); *Black v. Econo-Car International, Inc.*, 404 F.Supp. 600 (D.Mass.1975). Not only

are Samitri's RICO claims uncertain, and possibly without merit, but Samitri's other arbitrable claims clearly permeate the case.[8]

#### 4. *Securities Fraud Claims*

■■■ Samitri's final argument is that the claims it has alleged under various sections of the Securities Act of 1933, 15 U.S.C. §§ 77a–aa (1982), and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–kk (1982), are "nonarbitrable federal statutory claims." Although Samitri cites no authority for this argument, the Court must assume that Samitri is attempting to bring this case within the ruling of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), where the Supreme Court held that a dispute involving a claim of a violation of the United States securities laws was not arbitrable. However, as discussed above, the Supreme Court specifically limited the scope of the *Wilko* decision in *Scherk, supra*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, holding that claims brought under the United States securities laws which arise out of an "international commercial transaction" *are* arbitrable. Since the securities law claims alleged by Samitri arise out of an "international commercial transaction," those claims are arbitrable.

### CONCLUSION

For all of the foregoing reasons, the Court orders arbitration of all of Samitri's claims except the two brought under RICO, the litigation of which is temporarily stayed pending arbitration. The action is placed on the suspense docket pending the outcome of the arbitration.

SO ORDERED.

---

**8.** The Court notes, as an aside, that Samitri's RICO claims appear to have very little merit. Nonetheless, since the Court is constrained at this stage of the proceedings to consider only the question of the arbitrability of these claims, and since the present state of the law in the Second Circuit with respect to private civil actions under RICO is uncertain, *compare Moss v. Morgan Stanley Inc.*, 719 F.2d 5, Current CCH Fed.Sec.L.Rep. ¶ 99,478 (2d Cir.1983), *with The Trane Company v. O'Connor Securities*, 718 F.2d 26 (2d Cir.1983), the Court does not consider the substance of Samitri's RICO claims at this time.